## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAFAEL NAVARRO,<br>    *Plaintiff*,<br><br>        v.<br><br>TOWN OF STRATFORD,<br>    *Defendant*. | No. 3:22-cv-01254 (VAB) |

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Rafael Navarro ("Mr. Navarro" or "Plaintiff") has sued his former employer, the Town of Stratford ("Defendant"), asserting claims for employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"). Compl., ECF No. 1 (Oct. 7, 2022) ("Compl.").

Defendant has filed a motion for summary judgment. Mot. for Summ. J., ECF No. 36 (Feb. 12, 2024) ("Mot.").

For the following reasons, Defendant's motion for summary judgment is **GRANTED in part and DENIED in part**.

Summary judgment is **GRANTED** as to Plaintiff's discriminatory discharge claim.

Summary judgment is **DENIED** as to Plaintiff's hostile work environment and retaliation claims.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

    A.  **Factual Background[1]**

On October 24, 2019, Mr. Navarro—who is Hispanic—accepted a conditional job offer as an equipment mechanic for the Town of Stratford Public Works Department and began working in the Town Garage on November 11, 2019. Pl's Response to Def.'s Statement of Material Facts ¶¶ 4–5, 14, ECF No. 41-2 (Apr. 17, 2024) ("Pl.'s SMF"); Pl.'s Statement of Add'l Material Facts ¶ 2, ECF No. 41-2 (Apr. 17, 2024) ("Pl.'s Add'l Facts").

Charles Heuser directly supervised Mr. Navarro in the Town Garage. *Id*. ¶ 21. Mr. Heuser reported to Gary Catalano, the Town of Stratford's Superintendent of Vehicle Maintenance and Sanitation. *Id*. ¶¶ 15, 22. Other Town Garage employees included Glen Varza, Mike Scala, Thomas Marshall, and Sean Walsh. *Id*. ¶ 23.

As a new employee, Mr. Navarro had a probationary period for the first twelve months of his employment. *Id*. ¶¶ 7–8. Under the Town's protocol, monthly reviews of a probationary employee allegedly had to be conducted. Catalano Dep., Ex. 3 at 15:2–10, ECF No. 36-5 (Feb. 12, 2024) ("Catalano Dep., Ex. 3").

From the outset of his employment and continuing through the summer of 2020, Mr. Navarro allegedly experienced a variety of intimidating, hostile, and racist behavior in the Town Garage. Pl.'s Add'l Facts ¶ 4. Mr. Varza allegedly would, among other things, frequently smash hammers on the workbench when Mr. Navarro walked by. *Id*. Mr. Scala allegedly made comments such as "Jamaica doesn't exist," "Puerto Rico doesn't exist" and is a "made up country," and "blacks don't belong here," "blacks are slaves," along with other comments about "the crimes they are committing," as well as that immigrants "don't belong here. They need to be

---

[1] The following facts are taken from the Complaint, the parties' Local Rule 56(a) statements, and related documents. The facts are presented in the light most favorable to Plaintiff as the non-moving party.

back where they belong in Mexico." Mr. Varza and Mr. Walsh allegedly stated that Mr. Navarro was not qualified for his job and only got it because he "must know Raynae[,]" the Deputy Public Works Director, who is also Hispanic. *Id*.

On August 6, 2020, Mr. Navarro told his supervisor, Mr. Heuser, about the alleged racism experienced in the Town Garage. Pl.'s SMF ¶ 45. Mr. Heuser told Mr. Navarro to see Mr. Catalano regarding his complaint. *Id*. On that same day, Mr. Navarro reported his work environment to Mr. Catalano, who told Mr. Navarro to put his complaint in writing for the human resources department to investigate it. *Id*. ¶¶ 46, 48. On August 24, 2020, Mr. Navarro provided Mr. Catalano with his written statement. *Id*. ¶ 50.

On September 18, 2020, Mr. Catalano allegedly submitted months of negative performance reviews for Mr. Navarro. Pl.'s Add'l Facts ¶¶ 20–21. From November 2019 to May 2020, Mr. Navarro's previous performance reviews had been positive. *Id*. ¶ 3.

On September 22, 2022, Ronald Ing, the Human Resources Director, met with Mr. Navarro to review his complaint. Pl.'s SMF ¶¶ 51, 54. During this meeting, Mr. Navarro learned that the human resources department would be meeting with all employees to address professionalism, racism, and sensitivity at the workplace. *Id*. ¶ 60. Mr. Navarro then signed a summary of the investigation, indicating that it was an accurate summary. *Id*. ¶ 61.

Mr. Ing then met with other employees involved in Mr. Navarro's complaint, *id*. ¶ 63, and subsequently determined that there was no discriminatory or racist behavior against Mr. Navarro in the Town Garage, *id*. ¶ 64.

On October 21, 2020, the Town of Stratford held a sensitivity training for the employees of the Town Garage.[2] *Id*. ¶ 68.

---

[2] The sensitivity training held for the employees of the Town Garage is referenced throughout the parties' filings as

On his October performance review, Mr. Navarro received an overall rating of "unacceptable," *id.* ¶ 77, and on October 28, 2020, the Town of Stratford terminated Mr. Navarro for failure to successfully complete his probationary period. Pl.'s Add'l Facts ¶ 25.

### B. Procedural History

On October 7, 2022, Mr. Navarro filed his Complaint in this Court. Compl., ECF No. 1 (Oct. 7, 2022).

On December 7, 2022, the Town of Stratford filed its Answer to Mr. Navarro's Complaint. Answer, ECF No. 13 (Dec. 7, 2022).

On December 16, 2022, the Court entered a scheduling order based on the parties' Rule 26(f) Report. Scheduling Order, ECF No. 15 (Dec. 16, 2022); *see also* Rule 26(f) Report, ECF No. 14 (Dec. 15, 2022).

On February 12, 2024, the Town of Stratford filed its motion for summary judgment. Mot.; Mem. in Supp. of Mot. for Summ. J., ECF No. 36-1 (Feb. 12, 2024) ("Mem.").

On April 17, 2024, Mr. Navarro filed his opposition to the Town of Stratford's motion for summary judgment. Pl.'s Opp'n to Summ. J., ECF No. 41 (Apr. 17, 2024) ("Opp'n").

On May 22, 2024, the Town of Stratford filed a reply in support of its motion for summary judgment. Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. 46 ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

---

having occurred on October 21, 2023. This appears to be a typographical error because, based on the record, the correct date is October 21, 2020. *See* Navarro Dep., Ex. B at 148:4–10 ("Q. . . . Document Number 10 is a handwritten notation 'PW Garage Training Sensitivity.' And on the left-hand side, it lists the members of the garage department and their signature indicating that they had attended the training on that date of October 21st, 2020. A. Correct.").

56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (first citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and then citing *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

Title VII prohibits an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment . . . ,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation omitted).

In his Complaint against the Town of Stratford, Mr. Navarro brings race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII").[3]

The Court will address each claim in turn.

### A.  The Title VII Hostile Work Environment Claim

To establish a hostile work environment under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Brittell v. Dep't of Corr.*, 247 Conn. 148, 166–67 (1998) ("To establish a claim of hostile work environment [under CFEPA], 'the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'").

Additionally, a "plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). A plaintiff may do so by establishing a "supervisor's harassment of a supervised employee" or that "the employer 'failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Blue v. City of Hartford*, No. 3:18-CV-974 (CSH), 2019 WL 7882565, at *13 (D. Conn. Oct. 22, 2019) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).

---

[3] Mr. Navarro does not contest the granting of summary judgment as to his discriminatory discharge claim under Title VII, Opp'n at 1 n.1, and thus the Court will grant summary judgment as to that claim and begin with Mr. Navarro's hostile work environment claim.

"In determining whether a plaintiff suffered a hostile work environment, [courts] must consider the totality of the circumstances." *Littlejohn*, 795 F.3d at 321. A court ruling on a motion for summary judgment "may not properly focus on individual strands of evidence and consider the record in piecemeal fashion; rather, it must consider all of the evidence in the record, reviewing the record taken as a whole." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) (internal citations and quotation marks omitted). "[W]hen the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

Defendant argues that, although the atmosphere at the Town Garage may have been unfriendly, Mr. Navarro's allegations are not sufficiently severe or pervasive enough to alter the conditions of Mr. Navarro's employment. Mem. at 20–22. Defendant also argues that because there are no facts in the record suggesting that Mr. Navarro was harassed by a supervisor, he must—yet, cannot—establish that Defendant knew or should have known of the conduct and failed to take immediate and appropriate corrective action. *Id*. at 22–25.

In response, Mr. Navarro argues that, because racial epithets need not be directed at the plaintiff or related to only the plaintiff's racial minority group, a rational factfinder could conclude that he was subjected to a hostile work environment. Opp'n at 14–15. Mr. Navarro also argues that Defendant's *Faragher/Ellerth* defense fails because Defendant did not timely respond to Mr. Navarro's complaint, did not effectively respond to his complaint, and because the harassment continued after his complaint. *Id*. at 15–17.

The Court will address each argument in turn.

*1. Severe or Pervasive*

To establish a hostile work environment under Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citations and internal quotation marks omitted).

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22).

"The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). In determining whether a plaintiff established that there was a hostile work environment, courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Defendant argues that while Mr. Navarro may have experienced unfriendly, annoying, and immature behaviors, those "innocuous comments and actions" did not rise to conduct that a reasonable jury could see as hostility resulting from racial animus. Mem. at 21–22.

In response, Mr. Navarro argues that his co-workers made a variety of racially and ethnically derogatory comments that, although they were not all directed at him, could allow a rational factfinder to conclude that he was subject to a hostile work environment. Opp'n at 14–15.

The Court agrees.

In a hostile work environment claim, "'the crucial inquiry focuses on the nature of the workplace environment as a whole,' and 'a plaintiff who [himself] experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support [his] claim.'" *Kaytor*, 609 F.3d at 546 (citations omitted). Even if the discriminatory conduct is "merely episodic and not itself severe, the addition of physically threatening . . . behavior may cause offensive or boorish conduct to cross the line into actionable . . . harassment." *Id.* at 547 (citations and quotation marks omitted).

And "facially neutral incidents may be included . . . among the totality of the circumstances" as long as "a reasonable fact-finder could conclude that they were, in fact, based on [race]." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). To find such facially neutral events relevant, "some circumstantial or other basis" must exist "for inferring that [the] incidents . . . were in fact discriminatory." *Id.* This circumstantial evidence may include evidence that "the same individual" engaged in "multiple acts of harassment," some of which were overtly discriminatory. *Id.* at 375.

Additionally, "incidents relating to other minorities . . . may be of limited probative value, *but cannot be ignored on summary judgment.*" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000) (emphasis in original) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997)).

Mr. Navarro testified that on his first day of work, Mr. Walsh asked Mr. Navarro whether he "wanted the rope now or do you want the rope later." *Id*. at 69:2–7. Mr. Navarro alleges that Mr. Scala informed him that this was in reference to the employee formerly assigned to Mr. Navarro's toolbox, who died by suicide with a rope. *Id*. at 71: 14–25. Mr. Walsh also allegedly

asked why the cleaning lady works at the Town Garage if she did not know English. *Id*. at 75:17–22.

As to Mr. Varza, Mr. Navarro testified that, every couple of weeks, Mr. Varza would smash his hammer on the bench as Mr. Navarro walked by and remark "[y]ou don't have the qualifications I have" any time Mr. Navarro made a mistake. Navarro Dep., Ex. 1 at 88:4–17.

Mr. Navarro also alleges that Mr. Varza and Mr. Walsh would comment that Mr. Navarro got his position because he must know the Deputy Public Works Director, who is also Hispanic. Navarro Dep., Ex. B at 142:14–16.

Mr. Navarro also testified that Mr. Scala made numerous racists comments, including that Black people "don't belong here," that Black people should be put back "to being slaves again," "Hispanics don't belong here," "Puerto Rico doesn't exist" and Puerto Ricans "don't belong here," Mexicans were "crossing over," "Jamaica doesn't exist," and that they were all "made up countries" and that "Italians made up everything." Navarro Dep. Ex. 1 at 57:16–58:10, 123:21–126:11. Mr. Navarro alleges that Mr. Scala made these comments approximately four times. Navarro Dep., Ex. B at 150:17–20. Mr. Navarro also testified that Mr. Scala made jokes about "the Floyd case, about the black gentleman that actually got shot,"[4] and about Black people generally. *Id*. at 57:11–15.

---

[4] Because Mr. Navarro does not identify as Black or African American, these alleged "jokes" "may be of limited probative value[.]" *Whidbee*, 223 F.3d at 71. But, just as "[s]everal circuits have suggested that the particular racial history of the word ['n-gger'] (and perhaps, by analogy, associated anti-black imagery) is especially likely to be 'sufficiently severe[,]' *Rogers v. City of New Britain*, 189 F. Supp. 3d 345, 355 (D. Conn. 2016), the particular racial history of police brutality against Black Americans also can be considered to be severe, *see Vernio v. Higgins*, No. CV 19-3024 (DWF) (LIB), 2020 WL 3542757, at *4 (D. Minn. June 30, 2020) (noting that, given a "history of law enforcement's violent relationship with African Americans . . . allusions to the use of force by a police officer is no joking matter." (citing *Fatal Force*, Wash. Post, updated June 19, 2020, available at https://www.washingtonpost.com/graphics/investigations/police-shootings-database/.)). Thus, Mr. Navarro's allegations regarding comments made about other races and ethnicities "cannot be ignored on summary judgment." *Whidbee*, 223 F.3d at 71 (emphasis omitted).

While the Town of Stratford argues that these allegations are "innocuous" and "run-of-the-mill complaints," insufficient to serve as a basis for a hostile work environment, Mem. at 22, considering all of Mr. Navarro's allegations together, and in the light most favorable to Mr. Navarro, a reasonably jury could conclude that this work environment was "severe or pervasive enough that a reasonable person would find it hostile or abusive[,]" *Raspardo*, 770 F.3d at 114 (citing *Harris*, 510 U.S. at 21–22), on the basis of race.

"While a few isolated racial slurs may not create a hostile work environment for Title VII purposes, the repeated use of certain clearly offensive and abusive language can create a hostile work environment." *Owens v. N.Y.C. Dep't of Sanitation*, No. 11 CIV. 8297 (ALC), 2013 WL 150245, at *4 (S.D.N.Y. Jan. 15, 2013). And Mr. Navarro has presented sufficient admissible evidence to establish issues of material fact as to whether he was subjected to a hostile work environment on the basis of race. *See Kemp v. CSX Transp., Inc.*, 993 F. Supp. 2d 197, 212 (N.D.N.Y. 2014) (determining that there was sufficient admissible evidence in the record to establish issues of material fact as to whether the plaintiffs were subjected to a hostile work environment where they alleged that "they were subjected to vulgar racial language throughout their employment and often viewed racial slurs and Confederate flags displayed prominently on walls of regional offices" and identified "several specific employees who used racial slurs in their presence on specific occasions").

On this record, "[t]he Court cannot say that the application of the law to the present facts will reasonably support only one ultimate conclusion." *Notaro v. Fossil Indus., Inc.*, 820 F. Supp. 2d 452, 455, 458 (E.D.N.Y. 2011) (finding that "sufficient evidence exist[ed] to raise an issue of material fact as to whether [the defendant's] behavior rose to the level of an actionable claim for sexual harassment such that a jury could find the existence of a hostile work environment" where

the plaintiffs alleged that the defendant "continually and abusively harassed the Plaintiffs by utilizing sexually charged language" and "on a regular basis, . . . would throw and punch things in the office and would curse solely at [the plaintiffs]").

### 2. *Employer Liability*

As the Court has determined that there are issues of fact as to whether Mr. Navarro was subjected to a hostile work environment, the Court must now consider whether the Town of Stratford may be held liable for the allegedly hostile work environment.

An employer may avoid liability for a supervisor's harassment where it shows that (1) "the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see also Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (hereinafter "*Faragher/Ellerth* defense").

"The reasonableness of the company's response must be assessed by the jury based on the totality of circumstances." *Fornah v. Cargo Airport Servs., LLC*, No. 12-CV-3638 (RER), 2014 WL 25570, at *9 (E.D.N.Y. Jan. 2, 2014) (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998)). "Further, '[b]ecause there are often material issues of fact about the promptness and adequacy of an employer's remedial efforts, summary judgment is frequently not appropriate.'" *Payne v. JetBlue Airways Corp.*, No. 20-CV-00101 (NRM) (PK), 2024 WL 3360381, at *10 (E.D.N.Y. July 9, 2024) (quoting *MacMillan v. Millenium Broadway Hotel*, No. 09-cv-6053, 2011 WL 4357523, at *5 (S.D.N.Y. Sept. 16, 2011)).

Defendant argues that the undisputed evidence in this case establishes that the Town of Stratford had a reasonable avenue of complaint for its employees and that it took objectively reasonable corrective action as soon as Mr. Navarro complained. Mem. at 23–24.

In response, Mr. Navarro argues that the Court should deny summary judgment because the record contains ample evidence that Defendant failed to exercise reasonable care to prevent and correct the discriminatory conduct he alleges because it took Mr. Ing over a month to interview Mr. Navarro following his initial complaint, because Defendant concluded that no response to Mr. Navarro's complaint was necessary, and because the harassment continued. Opp'n at 17.

The Court agrees.

The record in this case is not so clear as to the adequacy of the Town of Stratford's response to Mr. Navarro's complaint to warrant the granting of summary judgment. *See Kasperek v. New York State, Dep't of Corr. & Cmty. Supervision*, No. 16-CV-671 (LJV) (MWP), 2022 WL 682633, at *8 (W.D.N.Y. Mar. 8, 2022). ("By its very nature, the question of whether a response to harassment was 'sufficient' is nearly impossible to gauge as a matter of law. Only when the answer to that question is easy or obvious should a court grant summary judgment on that issue.").

Mr. Navarro alleges that he first complained to Mr. Catalano about his allegedly racially hostile work environment on August 6, 2020. Navarro Dep., Ex. 1 at 95:9–23. In response to this complaint, Mr. Catalano allegedly requested that Mr. Navarro put his complaint in writing. *Id.* at 95:24–25. Mr. Navarro provided the written statement on August 24, 2020, alleging that Mr. Varza would often smash hammers on the work bench as Mr. Navarro walked by, tap wrenches while walking by Mr. Navarro, make comments that Mr. Navarro was unable to understand,

point fans that Mr. Navarro was using in a different direction, and turn down the radio that Mr.

Navarro was listening to. Written Compl., Ex. J to Ex. 6, ECF No. 36-18 (Feb. 12, 2024)

("Written Compl."). In his written complaint, Mr. Navarro also included the comments that he

alleges Mr. Scala made about Puerto Rican, Jamaican, and Italian people. *Id*.

On September 22, 2020—nearly a month later—Mr. Ing met with Mr. Navarro to

investigate his complaint, Navarro Dep. at 130:22–24, and on September 29, 2020, Mr. Ing met

with Mr. Varza, Mr. Walsh, and Mr. Rich regarding the complaint, Ing Dep., Opp'n, Ex. A at

75:10–13, ECF No. 41-3 (Apr. 17, 2024) ("Ing Dep., Ex. A").

Mr. Navarro agreed, in writing, that his complaints would be addressed by measures that

he and Mr. Ing had discussed, including a sensitivity training. *Id*. at 147:8–17; Investigation

Summary at 4, ECF No. 36-19 (Feb. 12, 2024) ("Investigation Summary"). The Town Garage

held the sensitivity training on October 21, 2020. *Id*. at 147:18–148:9.

Additionally, in Mr. Ing's deposition, he testified that, in his conversation with Mr. Scala

about Mr. Navarro's allegations, Mr. Scala admitted to having made those statements and no

actions were taken against him. Ing Dep., Ex. A at 78:2–20 ("Q. As you sit here today, your

recollection is that you had a conversation with Mr. Scala, and he admitted to having made those

statements? A. Yes. He gave me the form in which it was stated. . . . There was stuff on the

news, and I believe Mr. Navarro and him were discussing the current events, and Mr. Scala made

those comments and they laughed about it. Q. Did you wind up taking any action against Mr.

Scala for those comments? A. No, I did not. Q. Why did you not take any action against them

due to those comments? A. [N]othing was directed or about Rafael. It was just a general

conversation.").

Moreover, Mr. Ing testified that his notes memorializing the investigation may not be a complete account of his investigation. *See* Ing Dep., Ex. A at 68:1–8 ("A. I don't recall if I asked that question or not. Q. Fair to say if you did, it's not reflected on this document? A. Correct. Q. Is there a reason you would not have asked that question of Mr. Marshal? A. No."); *id.* at 73:17–74:6 ("Q. You're testifying now that there's actually questions that were asked that were not recorded here? A. Well, answers to a question, yes. . . . Q. Did you just forget to write that down? A. Apparently, I did."); *id.* at 76:10–77:5 ("Q. Did you meet with Mike Scala with respect to the concerns of racism that Mr. Navarro has raised regarding him? A. I believe I did. Yes, I did. Q. To your knowledge, did you prepare a statement from Mr. Scala when you met with him? A. If I met with him, I would have prepared a statement, yes. Q. I'm not going to represent to you that there was one and that I missed it, but I don't think we have one. Would you be able to double-check, Mr. Ing, and see if you have a statement? A. I will do that. . . . I know I spoke with him. I just don't -- I won't say I necessarily met with him in person. I may have done it over the phone for some reason. I'd have to double-check. I'd have to take a look to see if I have notes or not.").

In short, although Defendant took meaningful action in holding a sensitivity training, a reasonable jury could find that more—such as a more thorough investigation—was required in response to allegations that Mr. Navarro's co-workers commented that Black and Hispanic people do not belong here and to allegations that Mr. Navarro was experiencing intimidating behavior and feared personal retaliation. *See* Written Compl. ("My supervisor informed me that he would handle the situation with Glen Varza. Unfortunately, as a direct result from their conversation[,] Glen's behavior towards me became more personal and intimidating. With fear of personal retaliation and fear of losing my job[,] I kept my mind focused on work . . . ."); s*ee*

*also Payne*, 2024 WL 3360381, at *11 ("[W]hile JetBlue took certain prompt and meaningful actions in response to Plaintiff's allegations, a reasonable jury could find that more was required."); *Caban v. Richline Grp., Inc.*, No. 10-cv-559, 2012 WL 2861377 (S.D.N.Y. July 10, 2012) (denying summary judgment on hostile work environment claim and finding that a reasonable juror could "conclude that [the employer's] response was inadequate" and that the employer "too easily accepted [the assailant's] denials" where the employer investigated the complaints of harassment, reprimanded the assailant for a single incident, and warned him to stay away from the plaintiff).

Accordingly, the Court will deny Defendant's motion for summary judgment as to Mr. Navarro's hostile work environment claim.

### B. The Title VII Retaliation Claim

Title VII also makes it unlawful for an employer to discriminate against an employee because the employee has "opposed any practice made an unlawful employment practice . . . or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

"In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp.*" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The plaintiff employee must first establish a prima facie case by showing: (1) the employee engaged in an activity protected by Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between

the alleged adverse action and the protected activity. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citing *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotations omitted) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015); *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted).

Next, "the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *See McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (citing *Sista v. CDC Ixix N.A., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). "The proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Finally, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

The Town of Stratford argues that the Court may not infer retaliatory animus based on temporal proximity because dissatisfaction with Mr. Navarro's performance preceded his Complaint in this case. Mem. at 27. The Town of Stratford also argues that even if Mr. Navarro had established a *prima facie* case, he cannot establish that Defendant's legitimate business reason for his [termination] was pretextual, *id*. at 27–28, because the dissatisfaction with Mr. Navarro's performance began in June of 2020 and showed no sign of improvement through July, August, September, and October. Mem. at 27; Ing Aff. ¶¶ 35–36, Mem., ECF No. 36-8 (Feb. 12, 2024) ("Ing Aff.").

In response, Mr. Navarro argues that the approximately three-week period between his formal written complaint and the first negative performance reviews he received is sufficiently short to make a *prima facie* showing of causation. Opp'n at 8. Mr. Navarro also argues that Defendant's proffered legitimate reason essentially blames him for the fallout with his co-workers following his complaint as to their alleged racial discrimination. *Id*. at 11. Finally, Mr. Navarro argues that his progress reports from March 2020 to August 2020 were not submitted until September 18, 2020, after Mr. Navarro had complained. Opp'n at 8.

The Court agrees.

The period between Mr. Navarro's first complaint on August 6, 2020, to the date Mr. Catalano submitted negative performance reviews for Mr. Navarro in September of 2020—or even to the date of his termination on October 29, 2020—can be sufficient to draw an inference of causation. *See Fraser v. MTA Long Island Rail Rd.*, 307 F. Supp. 3d 105, 115 (E.D.N.Y. 2018) ("The lack of a bright-line rule has allowed the Second Circuit 'to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases.' In *Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990), for

example, evidence that a defendant took an adverse employment action against the plaintiff three months after he filed his EEOC complaint was insufficient to establish a causal connection. Under other circumstances, however, the court has found that lapses of six, seven, or even eight months were not too long to establish a causal connection. (internal citations omitted)).

And the progress reports from August and September corroborate the allegation that the human resources department did not receive them until September 2020. Progress Reports at 2–3, Ex. G to Ing Aff., ECF No. 36-15 (Feb. 12, 2024) ("Progress Reports"); *see also* Ing Dep. 37:20–38:2 ("Q. Some of the documents it appears to have a stamp for the Town of Stratford Human Resources Department. Do you see that? A. Yes, I do. Q. That would indicate when these documents were submitted to your department? A. That would be the date that we received them, yes."). The progress reports from June and July, however, do not have a stamp reflecting when the human resources department received them. Progress Reports at 4–5.

Mr. Ing testified that the lack of a date stamp means that those reports "may have been received in a package, and they may have stamped all of them at once" and that Mr. Navarro's progress report from July "could have been stamped with the one in August[,]" Ing Dep., Ex. A at 38:18–39:2, which was not submitted until September. Mr. Catalano, however, testified that he assumes—but cannot say for certain—that the date he wrote on the report is the day he completed the report, Catalano Dep., Ex. C at 51:25–52:6, Opp'n, ECF No. 41-5 (Apr. 17, 2024) ("Catalano Dep., Ex. C") ("Q. To the best of your knowledge, was this report done on June . . . of 2020? A. . . . I can't testify one way -- I can't swear to that. I would assume that's the date, so that's when it was done.").

The performance reviews that Mr. Catalano claims to have completed before Mr. Navarro's initial complaint—the June and July reviews—indicate that improvement was needed

in two categories: relationship with people and attitude. Progress Reports at 4–5. And Mr. Catalano testified that employees were complaining about Mr. Navarro before his complaint on August 6, 2020, but does not recall when. Catalano Dep., Ex. C at 29:5–20 ("Q. And you believe that prior to August 6th, some of the other employees were complaining about Mr. Navarro? A. Yes. Q. Do you recall when that started? A. I don't recall. Q. Did you make any record of the other employees complaining about Mr. Navarro? A. I never did anything written, no, that I recall. Q. So as far as you're aware, there's no document anywhere that would reflect when you first began receiving complaints from Mr. Navarro's coworkers about him? A. I don't think there was any written document, no."); *see also id*. at 51:8–19 ("Q. And then report No. 7, this is June of 2020, and now you denoted that Mr. Navarro needs improvement in his relationship with people and his attitude. Do you see that? A. I do. Q. What were the causes for the rating at that point in time? A. That's probably when I first became aware, I would assume. Again, this is going back three years. That's when the other mechanics were starting to come to me with complaints about Rafael's ability to get along and work with them.").

According to Mr. Catalano, Mr. Navarro's performance further decreased in August based on complaints from Mr. Rich and Mr. Varza. *Id*. at 53:25–54:11. The performance review from August, however, was dated August 14th and Mr. Varza's complaint was dated August 18th, and in response to this, Mr. Catalano testified that his August review of Mr. Navarro then "must have been [based on] Mike's complaint." *Id*. at 54:15–24. In any event, both the negative performance review and Mr. Varza's complaint arose after Mr. Navarro complained to Mr. Catalano on August 6th. And although Mr. Catalano believes that employees complained about Mr. Navarro before August, Mr. Ing testified that Mr. Rich's complaint against Mr. Navarro was received by his office on October 2. Ing Dep., Ex. 2 at 84:25–85:6.

In light of the delayed submission of the performance reviews, Mr. Catalano's testimony as to the reason for Mr. Navarro's negative reviews—alleged complaints from his co-workers—and the timeline in the record of those complaints, there remains a credibility determination for the jury as to whether Mr. Catalano drafted Mr. Navarro's first negative review in June, when it was dated, or a few weeks before it was submitted to human resources in September, and thus after Mr. Navarro first complained to Mr. Catalano on August 6th. *See Anderson*, 477 U.S. at 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment."). This credibility determination is necessary to resolving whether Defendant's legitimate, non-discriminatory reason for Mr. Navarro's termination—him not getting along with his co-workers, at least one of whom was a basis for his allegations of racial harassment, Navarro Dep., Ex. B at 148:16–149:4—is pretext.

Accordingly, the Court will deny Defendant's motion for summary judgment as to Mr. Navarro's retaliation claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **DENIED**.


**SO ORDERED** at New Haven, Connecticut, this 30th day of August, 2024.

 /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE